Eric Rosenberg, I'm counsel for defendant appellant for Thornwater Company and Jason Myers. And this appeal concerns two issues. I'd like to start first with the issue relating to Lanesboro Holdings. And our argument, of course, is that as a matter of law, Charles Moore did not justifiably rely on any oral statement by defendant Jason Myers to the effect that he could resell his interest in Lanesboro Holdings. And the focus of our papers was that the documents that Mr. Moore read and signed stated quite the contrary, clearly and repeatedly, often in bold and large-cap print. They stated that these were restricted securities and that there was no resale market for them. As indicated in our papers, also, Mr. Moore warranted in writing that he was not relying on anything that had been orally told to him. He was relying just on his writings. And he testified at trial, and it's in the record that he read those documents thoroughly, he understood them, he signed the subscription agreement. There's no issue there. Now, there are, of course, circumstances under which a plaintiff can justifiably rely on oral statements that are contrary to written statements in the offering materials, and they're rather narrow circumstances. In our original appellate brief, we noted that the attorney general and law enforcement agencies don't have to prove reliance, but there's a broader exception to that as well that's alluded to in the Carr case. That's the Judge Posner decision, and that is where a plaintiff's incompetent or has a relationship of excessive dependence on the defendant, then perhaps he may not be bound by those contrary written representations. But those are very far from the facts of this case. But why are those – why are the cases that you cite from the circuit courts construing the federal securities laws relevant when we have a very specific Washington State statute here? Well, the Washington State statute just defines making oral representations contrary to the written representations or negating the importance of oral – of the state statute, and that's a very broad exception to the statute. And there are instances, as I just indicated, where you could have justifiable – justifiable reliance under those circumstances, but this is not one of them. There is no justifiable reliance here. That Washington administrative rule which ties into the statute, that definition, does not dispense of the element of justifiable reliance, and that's a very broad exception to the statute. I totally agree with that, but why wasn't there justifiable reliance here? Well, there wasn't justifiable reliance here because the written documents clearly and repeatedly stated just the contrary of what the plaintiff claims that his case is, that the security can easily be resold if you have repeated written representations in the offering materials, that it cannot be resold. And also, you warrant in writing in your subscription agreement that you are relying only on the written materials and not on any oral representations. And that, of course, brings us to the case that the Court ordered the parties to discuss today, and that's Stewart v. The State of Steiner, which is directly on point. In fact, the facts of that case are not nearly as favorable for the defendants or were not nearly as favorable for the defendants there as the facts of this case are for these defendants, yet summary judgment was still granted. It buttresses the second reason why the writings in this case negate the element of reasonable reliance. The first, of course, was that the alleged oral misrepresentation was directly contradicted by the writing, and that was the first one. The second one, and the one that's the subject of the Stewart case, is that the plaintiff specifically warranted that they did not rely on any oral representations. Now, Stewart shows that plaintiffs represent. Where is that? Where did Warren sign that in the record? Just give me a record citation. You say he signed a subscription agreement that represented specifically he did not rely on an oral statement beyond the written documents. I believe it was Exhibit 27 was the private placement memorandum, Exhibit 26, trial Exhibit 26, and I gave you the page citation. I could take a step back, if you wish, and give you the tab number of our appendix where that document is. But you said he actually signed that representation, which makes it very similar to the Stewart case. Where is the – just give me the page number for where he signed the representation that he wouldn't rely on any oral documents, any oral statements. Let's see. Well, if I may. So it's tab 15 in ER page what? Page is where he makes these warranties as well. Let's see. In the subscription agreement, which is the document that I was just going through, it's at the top of page 8 of that agreement. And the private placement memorandum at pages Roman numeral 2, or two little i's, I should say, and 1, it says the same thing, that the investor is not entitled to rely on anything but the subscription agreement was signed by Mr. Moore at those pages. So you're – I don't have that – those particular pages in front of me, but you're representing that he actually went as far as to say I will not sign – I will not rely on any oral representations beyond the written materials. Yes. And I guess if I may, we can just bring this to the podium and read. So we're going to have tab 15, page 8. The undersigned acknowledges that the undersigned has received no representations or warranties from the LLC, the managing member, or any other person or entity in making this investment decision other than as set forth in the disclosure materials. That, again, is page 8 and tab 15 of our appendix. And similar things are written in the private placement memorandum at page 2i and 1 as well. So I believe that puts us squarely within Stewart, although Stewart – in Stewart, the defendants didn't even have the benefit of writings that directly contradicted the purported oral misrepresentations as we have here. Now, in the Stewart case, the Court listed eight factors, and I'd like to go through those eight factors, although not in numerical. Before you get into that, in our case, would you say that Mr. Moore was a sophisticated and experienced investor? Yes, that was undisputed. Undisputed. It was agreed? He stipulated? Or how was that? No, he didn't – when I say it was undisputed, he testified that he was wealthy, that he had a great amount of experience. This was from Mr. Moore's mouth. His expert witness, Philip Howhooth, also testified that he was an experienced and sophisticated investor. Mr. Howhooth also testified that Mr. Moore was intelligent. There's no question that he was highly educated and went through his educational history. He had more experience than just about anybody. I believe he had about 15 securities brokerage accounts in the past 10 years prior to the time that he made this investment. He had a relatively arm's-length relationship with his broker as well. He didn't have a familial relationship or other relationship of excessive dependency with his broker. Quite the contrary, he had never met his broker. He had only spoken to him on the phone. He had known him at this time for approximately a year and done some business with him, but he wrote down the results of his trades on his confirmations and account statements. He was paying attention to this. He was not relying excessively on his broker. He had a relatively arm's-length relationship. He was wealthy, sophisticated, intelligent, very experienced investor. This is not the case that is referred to in the dictum in Carr of somebody who's incompetent or who has a relationship of excessive dependence. This is the furthest opposite from that that one could get. What about the I was interested in the representation that the agent made to him was not that he could sell it. In other words, what what he is representing in the agreement was that he could not sell it. And the guy says, well, don't worry about it. I know the partners. One of them will buy you out. So it sounds like an intercompany, intracompany transfer, as opposed to what you would think is a sale on the market. Does that make any difference? Well, I submit it makes no difference. It really amounts to the same thing. If you can depart with it in exchange for consideration, that is selling it. And the written materials state in any number of different ways that you're going to be stuck with a security for a long time. You should not buy the security unless you can bear the risk of it for an extended period of time. There is no market for these securities. No market may develop, et cetera. So I think they cover the waterfront pretty well with that. And he was at the very least and I'm not certainly not depending on this, but he was at the very least more than very good inquiry notice. What he was being told was something different from what was in the documents. Let's say let's say that we agree with you that based on the Stuart case, that that portion of the jury verdict has to has to go away. What then? Well, I believe there should be judgment notwithstanding the verdict. Just on that amount. That was only a portion of what was claimed. On the thirty thousand dollars. On the thirty thousand dollars. Well, for that part of the appeal. And again, there are two parts of the appeal. That part of the appeal, we're just dealing with the thirty thousand dollars. The the other elements of the damages that that were awarded cannot be defended on this ground. They were completely you know, they were completely different. But reversing as to the thirty thousand dollar transaction does not say that you win the case. In other words, we don't vacate and remand with instructions to dismiss, do we? Well, just that part of the case. Certainly the sixteen thousand dollar award for breach of fiduciary duties. And there are several other awards for other claims. They remain in the case. I'm not going to walk out of this courtroom with a zero liability. The best I can do is knock out that thirty thousand and then knock out another fifty thousand for the double recovery. So if you wish, I can go through the the eight factors that the court listed and I'll try to do so rather quickly. And not in numerical order. I'm going to go through the factors that decisively are in favor of the defendants and which should dispose of this case or that part of this case, I should say. And the first is plaintiff's sophistication. And that again, decisively in favor of the defendants. This is a very sophisticated, experienced investor. Three, access to relevant information. Well, here the plaintiff had more than access. He had the information right in front of him in bold print. As I said before, this is more than inquiry notice, although inquiry notice, I believe under these circumstances for these factors would be enough. Factor number five, concealment of the true information. It was hardly concealed. It was repeatedly stated in the written materials that the plaintiff admitted that he read thoroughly and understood. And by the same token, factor number six, opportunity to detect the fraud or the truth of the matter. For the same reason, very strongly in favor of the defendants. And I would submit that whatever the other factors indicated, and I'm going to get to them in a couple seconds, those would dispose of this case, when I say this case, this part of the case. The other factors are, number two, existence of long-term or long-standing business relationship. And number four, I'm going to try to take them together and then separately, the existence of a fiduciary relationship. And I'd like to discuss them together for a second, because they appear both to be directed toward the relationship of dependence or not that the plaintiff may have on the defendant. And here it was not so great. Again, the parties had never met each other. Mr. Moore was an experienced investor. He had dealt with brokers before. He knew how to say no. He did say no on occasion. And there was no social or familial relationship that would suggest undue influence. In terms of fiduciary relationship element itself, it's a very close question. There is substantial case law indicating that securities brokers do not have general fiduciary duties to their customers. And at the trial transcript, pages 548 and 549, and that's the part where we objected to some of the jury instructions regarding fiduciary duty, several cases were cited to that effect. There's a Ninth Circuit case, the Wasco case, there's a District of Hawaii case, the Unity House case. There's some Second Circuit cases also that were cited. And as the Carr case, that's the Posner opinion, stated, if there's a fiduciary duty here, it's at the furthest reaches of fiduciary duty. So however one balances the second and fourth factors, it's going to be not heavily weighted in favor of the plaintiffs. And then the last two factors, the seventh and eighth, are clearly not as critical as the other factors. One is, did the plaintiff or the defendant initiate the transaction? And the answer is the defendant did in this case, but hardly dispositive in light of the other factors. And then the eighth, the generality or specificity of the misrepresentations. And I don't even know how to characterize that. There were fairly specific representations, but fairly covered as well by the written materials. Now, I'd like to move briefly, since I only have another two minutes, to the second part of the award. And I'm not going to add a whole lot to the briefs, which I think cover it and cover my arguments at least quite well, which is the award of $50,000 against Thornwater for failure to supervise Mr. Myers. In addition to the $121,000 joint award against Thornwater and Jason Myers constitutes a forbidden double recovery. And the district court found that Jason Myers and Thornwater caused the plaintiff $121,000 in damages. A jury went through each cause of action, breach of fiduciary duties, fraud, et cetera. The primary activity that it could actually cause damage to a plaintiff. And they found $121,000 worth of damages after the remittitures. Negligent supervision is a secondary liability. Supervision itself cannot directly cause additional damages. It can only allow the supervised person to commit damages. And if that supervised person only committed $121,000 in damages, awarding an additional $50,000 for allowing that $121,000 damages to occur is plainly a double recovery. It is recovering more than the jury found the amount of plaintiff's injuries. And that is all I have on that, Your Honors. Thank you, Counsel. Thank you. Good morning, Your Honors. I'm Bill Kinsel. I'm here representing the plaintiffs, the Pelley's, the Moore's. And I will move directly to addressing the Stewart v. State of Steiner case, which the Court brought to our attention yesterday. And I ---- I'm wondering why no one cited that case to us or gave it to the district court before, because it seems pretty on point. It's directly on point. And when it was cited to me yesterday, I looked at the decision date and it was decided the month after the reply brief was filed in this appeal. We do have a follow-up. We have a rule called 28J where you can advise the court of updated law. Yes. And I, in preparation for this oral argument, I ran a search on the relevant administrative code provision 460.1b.008, and that turned up nothing. And I think that's one of the key distinguishing factors between the Stewart v. Steiner case and this one, which is that a search for the fundamental basis for the cause of action for Lanesboro Holdings was not even discussed in the Stewart case. And really, when you acknowledge that fact, and I read that case very carefully, it is a fundamental flaw and a fundamental distinction in applying that case to this decision. And certainly, if I had seen it, it would have been cited because we would have been obligated to cite it to this court. And reviewing the case quite carefully, of course, yesterday, I didn't see any indication that the Washington Appellate Court had been referenced to Washington Administrative Code 460.21b.008 either. In fact, there's one specific reference that Mr. or Dr. Stewart had not cited to any authority for trying to distinguish between representations that were directly contradicted or not directly contradicted in a prospectus. So the simple answer is, you know, if I had run a search through Westlaw for a private placement memorandum, would I have found it? Yes. But I think the most critical factor is that the appellate court did not consider the basis for the Moore's claim in the case that was presented to Judge Kunauer and to the jury in this case. And that, just to quote it for the court, although I'm sure that they're familiar with it, is that 460.21b.008-2 says, A broker-dealer who engages in one or more of the following practices shall be deemed to have engaged in an act, practice, or course of business which operates or would operate as a fraud as used in RCW 21-2001. Subsection 2, contradicting or negating the importance of any information contained in a prospectus or other offering materials with intent to deceive or mislead. I think the defendants missed the point that the presence of a written document that is contradicted is the key point in this case. We had a written document that Mr. Myers lied about. The jury concluded that when it found in favor of my client. Also note, I think this is an important distinction between our general cause of action of the State Security Act and this particular claim, which is, generally speaking, you do not need to prove scienter. The Washington Administrative Code 460.21b.008-2 reinserts that requirement. It says that the contradiction or negation must be made with intent to deceive or mislead. That's a significant addition to the burden of proof. That requirement is quoted in the jury instructions and the jury found in favor of my client. They found that Mr. Myers lied. Let me ask you this question. Mr. Moore signs the document saying I'm only relying on what's in the writing in front of me. Now, how can the broker contradict that? The broker is saying something else. He is not contradicting Mr. Moore. Mr. Moore's statement stands. Mr. Moore's testimony at the records and supplemental exits of record 87 and 88 testified directly that he said, I don't want to participate in this because it's not liquid. I can't sell it. Mr. Moore said Mr. Myers was false. But we're focusing on one of the brokers that was committing fraud. Yes. How can the broker contradict Mr. Moore's statement in writing? I am not relying on it. How is the broker capable? How is he in a position to contradict Moore? No, I'm asking don't say the burden. How does he contradict him? How does he contradict him in writing? No. Understand my question. Moore says I am not relying on any oral representation. Okay. How does the broker contradict that statement? By saying that I can sell it for you? I guess I'm still ‑‑ No, he's not contradicting the statement that Moore is not relying on it. That's a separate statement. But he is not contradicting Moore's statement I'm not relying on it. Don't you understand that? Yes. But Mr. Moore testified in his trial that he did rely on it. Well, I know that. But the question is in writing he said that he is not. Yes, he did. So we don't get into this provision that you cited. I would disagree because the private placement memorandum that includes a nonreliance provision does not give a broker a license to lie. Well, this is, I guess, I'm going to turn around. Maybe this will get to the point. Okay. I don't know. The way I hear Judge Noonan's question is by Mr. Moore signing a document saying that he's not relying on anything other than the written representations. Is he committing fraud on the broker by asserting or relying on the oral representations that he claims were made? He has a representation, too. That's a legitimate question that I think the Washington State Legislature answered. When it says we have a problem here, we have a situation where investors are investing and brokers are trying to earn a commission, and we make a public policy decision that, and as we state in the Washington Administrative Code, that if a broker directly contradicts what is stated in that private placement memorandum or other offering prospectus, then they have committed fraud. I think the question as posed in a common law setting is a more difficult one. It's one that has been decided in circuit court cases, decided, too, by the defendants, but our state legislature has chosen to disagree. And it enacted, or it enacted is the wrong word, but it put into force Washington Administrative Court 46021B008 to deal with the situation. It is a policy choice because it is true that clearly in any given situation, the equities may fall one way or the other. What our state decided to do was to allow investors in the same situation as my client to present their case to a jury, to have them hear the evidence, and to have them make decisions as to who was lying to whom. And there's extensive testimony. The jury was presented with all the evidence that deals with the eight factors that my opposing counsel presented and discussed, and the jury decided that Mr. Myers had lied and had directly contradicted. I just look, I mean, as a purchaser of securities on occasion, if someone were trying to do a wink and a nod or a side deal saying, oh, but we can place your securities if you need to with people in the company, I would insist that it be in writing because I would want that in writing as well as the other representations. Then you would be a more sophisticated investor than my client. I think that the jury's job is to assess the totality of an individual plaintiff's experience and his presentation and credibility in his testimony and the credibility and testimony of the defendant and to make the decision as to what is this relationship like. There's also evidence in the record that Mr. Myers had managed to make the Moores quite a lot of money on trading U.S. Treasury bonds. And, you know, making somebody a lot of money on something is a good way to gain their trust. Now, of course, the defendants failed to disclose the fact that they were jacking up the commissions and earning far more than was justified under the circumstances because under U.S. Treasury bond confirmations, commissions are not disclosed. So there's a history in this relationship whereby the defendants gained the trust of my client by having made them some significant money, but all along they were misleading and lying. And there was substantial testimony about the U.S. Treasury bonds. How did Mr. Moore explain his unequivocal statement that he was not lying on oral statements? The testimony is at, let me just find it quickly here. This is at page 88 of the Supplemental Excerpt of Records, which is page 147 of the transcript. Was Mr. Myers' representation to you regarding his ability to find someone to buy your interest in Lanesboro Holdings important to your decision to buy that security? Well, it was paramount. When you say paramount, what do you mean? Well, I mean I would not subscribe to it unless he said he could sell it. And, again, why did you find his statement that he could sell it for you credible? Well, I wouldn't have thought he would have lied to me. I'm asking you not about that, but how did he explain his own apparent lies? He signed the statement, I'm not lying. How did he explain his doing that? Because in the interaction. He didn't explain it at all. I believe it's explained by the course of conduct and the interaction of the testimony. He did not explain I lied when I signed the document. Is that right? No, because I don't believe he thought he lied. And I think the context of the conversation shows that I'm not going to buy it because I can't sell it. He's telling him that, Mr. Myers. And then in response, Mr. Myers says, oh, but I can sell it for you. I can dispose of it for you. So he hasn't hidden anything from the broker. He has engaged in a direct conversation with Mr. Myers where he says that I don't want it. I can't sell it. But he's signing a document saying I'm not lying. The only thing I'm told orally. But it's just been explained to him why what the document says does not directly address his concern. And it's in that context that he's signing. The person who the court is expressing concern about, the broker, knows Mr. Moore's state of mind. He doesn't want to buy anything that he can't sell. So the person who is selling it to him knew his state of mind. I don't want it if I can't sell it. And Mr. Myers responded, I'll sell it for you. Don't worry about it. And so I really do not think it's the context of I'm lying to you. Because he didn't conceal from Mr. Myers his concern. What was stopping him from buying that security? I just want to go back to the Stewart case again. Sure. We, just to tell you, my law clerks did this research and didn't come up with the Stewart case either. And we agree that since it wasn't that particular statute, 46021B0082, was not cited in the Stewart case, that that would be a reason that one couldn't find it, you know, in the search for law under that statute. But if Washington didn't have that statute, then it would be operating consistent with the federal securities laws, which have a per se rule that you just don't go beyond what was in the writing. Yet the Stewart case, not citing that statute, rules on the basis of the totality of the circumstances. So it seems to be applying the same concept that emanates from the statute that's at issue here, because it employs the same reasoning as the reliance justified. So why shouldn't we employ the reasoning of that case, even though the statute isn't specifically cited? Because the absence of the statute in this decision provides, I think, an underlying environment for that court in this decision where it does not recognize the public policy choice of our State. But it applied the same rule. It applied the rule that's derived from that public policy choice. And what it did was it ran through those eight factors, and it decided in that case, in the absence of that Washington administrative code provision, that Mr. or Dr. Stewart had failed to pass the hurdles allowing him to go to trial. And in the case, there's a specific reference where it says that Dr. Stewart, if I can, was not alleging fraud. And if I can find. And here, of course, that is the basis for our claim. They're not they are not saying that the broker is free to or it's page 269 of Stewart. And I quote, We also note that Dr. Stewart did not allege that he was fraudulently induced into signing the agreement. That's what happened to Mr. Moore. He said, I don't want to sign it because I can't sell it. Mr. Meyer said, oh, you can. Don't worry about it. That was a fraudulent inducement. But both your case and Stewart require reasonable reliance and look at the eight factors. Yes. So what difference does that make? The analysis we're really addressing is the reliance. The another distinguishing factor is at page 274 of Stewart, where it says, We are mindful of the admonition that our state securities laws are to be interpreted liberally to achieve the desired effect of protecting investors. Thus, the fact that one signs a nonreliance provision in a subscription agreement is not necessarily dispositive. That's at page 274. So basically, what I hear, sort of the underlying theme of the question, is that it is becoming dispositive. If you've signed it, it's dispositive because you've run it through those factors and no matter what happens, because you've signed it, it's dispositive. So actually, the district court here did not have the benefit of the Stewart case. That's correct. And he let this claim go forward. And he also had the benefit of the Washington administrative code, which the Stewart appellate court did not have the benefit of. Well, I'm sure that they did. They had access to it, but it wasn't there. It existed. So maybe we should remand this case and let the district court rule on the basis of the subsequently controlling law. If the court was going to do something of that sort, I would suggest that it instead be certified to the State Supreme Court, because then we're just running through the trial court making another decision which would be subject to an appeal. I mean, if the court feels that there's a conflict here which should be resolved, I would suggest that it be done, be a certification to the State Supreme Court where it can be resolved finally instead of going through a number of steps. I think that would be the most efficient way to do it. Because clearly there is a problem with the Stewart case because they've been passed in the night. It seems to be the same law. I know. I know. And, you know, I don't think that my client should be handicapped by the failure of Dr. Stewart to have properly briefed and raised this issue. I cannot imagine that if this appellate panel had been aware of this provision of the Washington Administrative Code that it would not have been addressed. I mean, obviously it's directly on point. It's in a provision that says that if you do this, the broker shall be found to have committed fraud. I mean, it's directly on point. And I don't think that my client should be penalized for Dr. Stewart's failure to have properly researched that issue. And also substantively, though, you know, here we had a jury. Maybe it shouldn't have, you know, Stewart's case, you don't go to a jury. But here the jury considered all those factors. My opposing counsel was referring to all the testimony, all the things that relate to those eight factors were presented to the jury. And they were presented a quotation of the case about reasonable reliance, what does reasonable reliance mean. That language is in the jury instructions to the jury that decided the Moore case. And they made the decision. They engaged in the balancing act that the court has been expressing its concern about here and decided that the person who was lying was Mr. Myers and the person who was misled was Mr. Moore. Do you agree that Mr. Moore was a sophisticated, experienced investor within the meaning of that term, those terms in the Stewart case? He certainly had a substantial amount of investment history. Was it sophisticated enough to be a disqualifying factor? No, I don't think so. I mean, he trusted his brokers. He trusted Mr. Myers. And, you know, sophisticated people can be misled just as easily as unsophisticated people. And it does not excuse fraud. I mean, fraud should be legal for the wealthy. You know, a wealthy victim should not be penalized and have no remedy for fraud simply because he's wealthy. The law should be equal and it should be applied to protect everyone, whatever means. Usually our courts are concerned about access to justice for the poor. But in essence, this is a reverse, a flip. Oh, you made substantial sums of money through the course of your life. You have a $4 million estate. Well, that's great. I mean, that's what our society is supposed to do. But does that mean that now you're a target for everybody who wants to come and defraud you? All right, counsel. Thank you. You're over your time. All right. The case of Moore v. Thornwater will be submitted. Reed v. Livingston Auto Center is submitted on the briefs. U.S. v. Scribner is submitted on the briefs. And we will take up U.S. v. Patton.
judges: Noonan, T. Nelson, Wardlaw